UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| D.A., a minor child,<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br>Administration,<br>　　　　Defendant. | CIVIL ACTION<br>NO. 11-40216-TSH |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR ORDER REVERSING (Docket No. 12) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 17)**
**September 30, 2013**

**HILLMAN, D.J.**

### Nature of the Proceeding

This is action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying plaintiff D.A., a minor child ("D.A."), Supplemental Security Income ("SSI") benefits. D.A. has a Motion for Order Reversing the Decision of the Commissioner (Docket No.12). The Commissioner has filed a cross-motion, Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket No. 17). For the reasons stated below, D.A.'s motion is denied and the Commissioners motion is allowed.

### Procedural History

On April 24, 2009, D.A., through his guardian Cindy Belseth, filed an application for SSI benefits with the Social Security Administration ("SSA"). He claimed a disability resulting from

1

a combination of impairments: lazy eye, complex cyanotic heart disease, attention deficit hyperactivity disorder, ("ADHD"), and post traumatic stress disorder ("PTSD").  (*Tr.* at 20).[1] After the original application and application for reconsideration were denied, D.A. requested a hearing before an Administrative Law Judge ("ALJ").  That hearing was held on April 18, 2011; testimony was taken from D.A. and Ms. Belseth and the ALJ considered numerous medical and school records presented by D.A.  On May 27, 2011 the ALJ issued a decision finding that D.A. was not disabled.  (*Id.* at 17-39).  After exhausting his administrative remedies, D.A. now seeks reversal of the Commissioner's decision, while the Commissioner asks the Court to affirm.

## Background

*Treating Physicians' Reports*

As reflected in the record exhibits, D.A. has a documented history of mental and behavioral problems which constitute the gravamen of his Motion to Reverse.[2]  D.A. is a minor male child born December 15, 2000.  His treating physician, Dr. Beverly Nazarian, first suspected he had ADHD during an office visit in 2006, (*Tr.* at 372), and she formally diagnosed him and prescribed medication for the condition in November 2008.  (*Id.* at 323).  Dr. Nazarian based her diagnosis on reports from home that D.A. was "constantly moving," "can't sit still," "doesn't seem to hear," and "doesn't do work" and "walked around" at school.  (*Id.* at 324).  In December 2009, Dr. Nazarian completed a form for the SSA regarding D.A.'s functioning, in which she stated that he had "poor self-control" and "emotional outbursts," and that his concentration was "significantly impaired."  (*Id.* at 327).  Additionally, in June 2010, Dr.

---

[1] A transcript of the official record ("*Tr.*") has been filed with this court. (Docket No. 11).
[2] Although D.A. claimed a disability based on a heart condition and wandering eye before the SSA, he is not challenging the Commissioner's findings with respect to those ailments. *Brief in Support of Mtn. to Reverse*, at 11 (Docket No. 13).  Consequently, only his mental and behavioral problems will be discussed in this opinion.

2

Nazarian wrote a letter to the SSA characterizing D.A.'s impairments, stating: "If he missed his medication, he has been described as 'off the wall,' constantly talking, and needing to be brought back on task." (*Id.* at 429). She also noted that he continued to have difficulty at school and on the bus, and that he acted defiantly and had temper outbursts. (*Id.*). In a questionnaire attached to the letter, Dr. Nazarian concluded that D.A.'s limitations in the areas of inattentiveness, impulsiveness, hyperactivity and difficulties in maintaining concentration were "extreme," while his cognitive functions, social functioning, and personal function were only "moderately" limited. (*Id.* at 430-31).

In December 2008 and July 2009, after D.A.'s diagnosis of ADHD, Dr. Phyllis Pollack, D.A.'s treating cardiologist, stated in treatment notices that she considered D.A. to be a "delightful boy." (*Tr.* at 256, 260, 376). She made the same notation in reports dated February 21, 2008, and December 21, 2006. (*Id.* at 378, 381).

In addition, D.A. received treatment from a number of mental health professionals. He received home visits from clinicians at South Bay Mental Health Center for several months in 2009. During an August 5, 2009 visit, a counselor indicated that D.A. exhibited signs of worthlessness, anxiety, irritability, and hyperactivity. (*Tr.* at 301). On October 15, 2009, he was described by the same counselor as "anxious and oppositional to questions," and, reportedly, he had fights at school. (*Tr.* at 296).

In late November 2009, a treating psychiatrist, Dr. John J. Diggins, evaluated D.A. after D.A. reported possible sexual abuse. (*Tr.* at 303-308). Dr. Diggins noted that D.A. had a "longstanding history" of behavior disturbances reported by his guardian, who called D.A. an "instigator," meaning he would initiate trouble with other children by taking their toys and kicking them. (*Id.* at 305). During the evaluation, however, Dr. Diggens determined that D.A.

3

was "pleasant," became relaxed during the course of the session, was "eager to please," and that his thought process, memory, and cognition were "within the range of normal" and "age appropriate." (*Id.* at 306). In December, the doctor described D.A. as "cooperative" with a "linear" thought process. (*Id.* at 303). Nonetheless, D.A. reported to Dr. Diggens that he had recently become "really angry" with his brother and guardian and had screamed at them. (*Id.* at 303).

During the same period, D.A. began to see Steve Kennedy, a clinician at the Child Advocacy Center where D.A. was referred after the sexual abuse report. (*Tr.* at 389-94). In December 2009, Mr. Kennedy initially assessed D.A. as uncooperative, anxious, controlling, hyperactive, impulsive, angry, demanding, aggressive, and inappropriate, among other traits. (*Id.* at 389). Mr. Kennedy also noted that daily anger outbursts, destruction of property, and non-compliance were among D.A.'s frequent behaviors. (*Id.* at 390). Mr. Kennedy concluded that D.A. suffered from PTSD. (*Id.* at 392).

On January 26, 2010, Mr. Kennedy, together with his supervisor Dr. Jennifer Hylton, Psy.D, completed a questionnaire issued by the SSA which required him to assess issues related to D.A.'s ADHD diagnosis. (*Tr.* at 396-97). Mr. Kennedy determined that D.A.'s level of inattentiveness, hyperactivity, and impairment in age-appropriate social functioning exhibited "marked" limitations, while his limitations in the area of impulsiveness was "extreme." (*Tr.* at 396). In April 2010, Mr. Kennedy completed a final evaluation of D.A. at the termination of their clinical relationship. He reported that D.A. had made "moderate gains" with respect to behavior disturbance and elimination of destructiveness, although he continued to exhibit "oppositional behaviors with his guardian." (*Id.* at 434). Mr. Kennedy noted that D.A. was "proud of progress he had made in both home and school settings." (*Id.* at 435).

4

D.A. continued therapy through 2011. He saw social worker Jillian Faria from January through March 2010 for treatment with his coping skills, anger, and school problems. (*Tr.* at 417-28). In March, she described his behavior as hyperactive and his impulse control as inadequate, but his orientation, judgment, and thoughts as normal. (*Id*. at 427). D.A. began seeing counselor Mary Wells in or around March 2010. She indicated that he was initially very angry about receiving therapy from her and was hyperactive. (*Id.* at 500). In May, Ms. Wells reported that D.A. was depressed, but that his school performance was improving. (*Id.* at 495). He continued to exhibit anger, oppositional behavior, and hyperactivity during their visits through September 2010. (*Id.* at 476-500). However, Ms. Wells' records indicate that these symptoms appeared to improve. On September 13, 2010, she noted that D.A. had made progress in both his school and home behavior. (*Id.* at 474). Notes from November 2010 show that his attitude and behavior were stable at school and home, although he continued to have some arguments at home. (*Id.* at 467). In early December 2010, Ms. Wells reported that D.A. was improving in his "attention to task and social skills." (*Id.* at 466).

In January 2011, D.A. was evaluated by a clinical nurse specialist, Kimberly Gage, who assessed that his behavior and mood as within normal limits. (*Tr.* at 463). She also stated in her clinical narrative that D.A. was doing well in school and had received a "good citizen" award. (*Id.*). Despite these gains, there was some indication that D.A.'s behavior was still problematic; on April 12, 2011, Ms. Gage noted that Ms. Belseth reported that D.A. continued to be hyperactive and difficult to re-direct. (*Id.* at 502).

*School Records*

Contemporaneous school records show that D.A. had some limitations at school. On March 27, 2008, D.A. was examined by Loretta A. Burdulis, a school psychologist, who

5

assessed whether his disability was affecting his ability to learn. (*Tr.* at 398). During this assessment, which occurred prior to his ADHD diagnosis, Dr. Burdulis observed that D.A. had difficulty concentrating and he acted impulsively. (*Id.* at 400). She administered three standardized tests and concluded that D.A. scored slightly below average in general ability; was average in verbal comprehension, perceptual reasoning, and working memory; but had significant weaknesses in short-term visual memory and visual processing speed. (*Id.* at 402).  \

D.A. received an Individualized Education Plan ("IEP") for February 2009 through February 2010, which took into account Dr. Burdulis' findings. (*Tr.* at 265). The IEP indicates that D.A. exhibited "many task avoidance tendencies" when working in large groups. (*Id*. at 265). Accommodations included small group instruction, review and repetition, pre-teaching new concepts, and untimed tests. (*Id.* at 266). D.A. also received one hour of additional academic support per week and a half hour of occupational therapy. (*Id.* at 270). No other modifications, such as a shorter school day or school year or special bussing, were required. (*Id.* at 271).

A teacher progress report from March 9, 2009, states that D.A. had trouble focusing in class and staying seated. (*Tr.* at 277). A progress report from October 5, 2009, also indicates that D.A. could not focus or complete tasks. (*Id.* at 206). The assessment for D.A.'s February 2010 through February 2011 IEP notes that D.A. continued to struggle with written assignments, and his classroom teacher reported that D.A. could be "non-compliant" when he disliked particular assignments. (*Id.* at 406). The IEP, however, recommends the same accommodations as the prior year, (*id.* at 407, 412), except that D.A.no longer required out-of-class instruction. (*Id.* at 411).

*Consulting Physicians' Reports*

Additionally, state medical examiners reviewed D.A.'s medical records. Each consulting doctor was asked for his or her opinion about whether D.A.'s impairments met the SSA's requirements for disability. The first two consultants, Elaine Hom, M.D., and Orrin Blaisdell, Psy.D., issued their determination in August and September 2009. (*Tr.* at 286-90). To make their determination regarding D.A.'s functional abilities, they examined medical records produced at least through July 8, 2009, as well as school records. (*Id.*). For five of the six fields examined, D.A. was considered to have "less than marked" limitations, in part because he was receiving school services through his IEP, and became his ADHD was diagnosed as "improved" by Dr. Nazarian, with the use of medications, as of July 8, 2009. (*Id.* at 288). His diagnosis of ADHD was determined to be "credible." (*Id.* at 291).

Psychologist Dr. Brian O'Sullivan and pediatrician Dr. Ramesh Mundra conducted a second assessment in January and February, 2010. These doctors examined records at least through October 23, 2009. (*Tr.* at 333-37). Again, D.A. was found to have "less than marked" limitations in the categories of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and health and physical well-being;" he was found to have no limitations in the other categories. (*Id.*). These doctors recognized that D.A.'s counselors had noted his tendencies to be anxious, oppositional, and fidgety, as well as his problems with self-control and making friends. (*Id.* at 334).

*Reports from D.A. and Edith Belseth*

In June 2009 Ms. Belseth told the Department of Disability Services that D.A. did not have any day to day restrictions and di not have emotional problems like other children, but did have partial deafness, was on an IEP, and was an instigator. (*Tr.* at 23). In October 2009, Ms.

7

Belseth made another report, noting that D.A. found it difficult to sit still long enough to learn, but could make new friends, and got along with her, other adults, and teachers. (*Id*.) D.A. and Ms. Belseth both testified at a hearing held before an ALJ on April 18, 2011. The ALJ evaluated D.A. as "bright, lighthearted, and extremely social." (*Id.* at 31). D.A. told the ALJ that he was doing "a little bit" better paying attention. (*Id.* at 51). Ms. Belseth told the ALJ that D.A. continued to act inappropriately in school and reported that the school was concerned about his behavior, including an incident in the playground when D.A. was bullied by other students. (*Id.* at 54-55). On the record, the ALJ recognized that D.A.'s ADHD "can be very disturbing but it is manageable." (*Id.* at 56).

## ALJ's Findings

After evaluating all the records before her, the ALJ determined that D.A. did not have a disability as defined by the SSA. She gave "some weight" to the assessments by Dr. Nazarian, Mr. Kennedy, and Dr. Hylton, but noted that there was little to corroborate D.A.'s "self-reporting of history or symptoms." (*Tr.* at 30-31). The ALJ also recognized that the other treating physicians, Dr. Diggins and Dr. Pollack, provided reports that were somewhat at odds with Dr. Nazarian and Mr. Kennedy's assessments. (*Id*. at 31). The ALJ found D.A. and his guardian not fully credible, so the ALJ questioned these self-reports. (*Id.* at 30). In particular, the ALJ found that Ms. Belseth's testimony, and other reports submitted to the SSA in support of the claim, were "inconsistent with objective medical evidence, which revealed that the claimant has been making progress with his physical and psychological issues and with the opinions of the State Agency medical consultants." (*Id.* at 31). The ALJ assigned "great weight" to the consulting doctors, who "are familiar with SSA policy and regulations and based their opinions on the medical records that were available at that point in time." (*Id.* at 31). Examining the record with

8

these factors in mind, the ALJ concluded that D.A. had a less than marked limitation in acquiring and using information, (*id.* at 32); a less than marked limitation in attending and completing tasks, (*id*. at 34); a less than marked limitation in interacting and relating with others, (*id.* at 35); no limitation in moving about and manipulating objects (*id.* at 36); no limitation on the ability to care for himself, (*id. at* 37); and a less than marked limitation in health and physical well-being, (*id.* at 38). Based on these determinations, the ALJ concluded D.A. did not meet the regulatory requirements to be found disabled.

## Issues Presented

D.A. bases his motion on four claims of error by the ALJ which were adopted by the Commissioner: that she failed to accord sufficient weight to the opinions of the treating physicians; that she improperly accorded great weight to the opinions of non-treating, non-examining medical reviewers; that she failed to properly assess the credibility of the witnesses at the hearing; and that she substituted her law judgment for that of the medical professionals. *Brief in Support of Mtn. to Reverse*, at 2 (Docket No. 13). Consequently, he argues that the ALJ's findings regarding D.A.'s limitations were incorrectly decided.

### *Standard of Review*

Review by this court is limited to whether the Commissioner's findings are supported by substantial evidence and whether she applied the correct legal standards. *Manso-Pizarro v. Sec'y of Heath & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). So long as the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record could arguably support a different

conclusion. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). When applying the substantial evidence standard, the court must bear in mind that it is the province of the Commissioner to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts about the evidence. *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal of an ALJ's decision by this court is only warranted if the ALJ made a legal or factual error in deciding the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro*, 76 F.3d at 16.

### *Weight Accorded Treating Sources*

To make her determination of disability, the ALJ had to determine whether D.A. exhibited significant functional limitations in any of the following domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, (6) health and physical wellbeing. 20 C.F.R. § 416.926a(b)(1). In order to be found disabled, D.A. either must have "marked limitations" in two domains of functioning, or an "extreme" limitation in one domain of functioning. *Id.* "Marked" limitations are those limitations that are more than "moderate" and less than "extreme" and that " interfere seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 CFR § 416.926a(e)(2)(i).

Dr. Nazarian, Mr. Kennedy, and Dr. Hylton submitted reports that D.A. was "extremely" disabled in four of the six functional areas, yet the ALJ only accorded these opinions, and their other assessments of D.A., "some weight" rather than "controlling weight." (*Tr.* at 30-31). The regulations do not require the ALJ to accord any deference to conclusions of disability, instead

decisions are "reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(d)(1). Thus, the clinicians' conclusions of "extreme" or "marked" disability are not entitled to any deference. Otherwise, treating sources are normally are accorded controlling weight, but can be given less weight if they are in some respects inconsistent with other substantial evidence on the record. 20 C.F.R. § 416.927(c)(2) ("If we find that a treating source's opinion . . . is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). Where, as here, the ALJ does not give the treating sources' opinions controlling weight, the ALJ must consider the following factors: length of the treatment relationship; nature of the treatment relationship, including the "kinds and extent of examinations and the testing the source has performed; supportability, meaning that the medical source provides laboratory testing or other evidence to support his or her position; whether the opinion is consistent with the record as a whole; and specialization of the provider. 20 C.F.R. § 416.927(c)(2)-(5). The court's role is not only to ensure that the ALJ complied with these regulations, but also to ensure that the ALJ's findings of fact are supported on substantial evidence on the record. *See Ortiz*, 955 F.2d at 769

The court concludes that the ALJ complied with the regulations and the decision is supported by substantial evidence. As the ALJ noted in her decision, and as reflected in the Findings of Fact, *supra*, the opinions and findings of Dr. Nazarian and Mr. Kennedy are frequently in conflict with other treating physicians, including Dr. Diggins and Dr. Pollack and D.A.'s therapists from 2010 through 2011. Even Mr. Kennedy's own records indicate that D.A. had made improvement with therapy, and Dr. Nazarian noted his behavior could be off-the-wall *if* he missed his medicine. (*Tr.* at 29-30) (emphasis added). Dr. Nazarian and Mr. Kennedy

frequently note D.A.'s behavior problems at school, but these are not borne out by his school records, which contain no notes of disciplinary actions at school or on the bus, nor his receipt of the "good citizenship" award in 2011. (*Id.* at 463). Given these inconsistencies, it was appropriate for the ALJ to not accord controlling weight to the treating sources. 20 C.F.R. § 416.927(c)(2).

The ALJ explained that she only gave some weight to treating doctors because they based their opinions predominately on D.A.'s self-reporting about the severity of conditions, and the ALJ found D.A. and his guardian Ms. Belseth to be less than fully credible about the severity of his conditions. (*Tr.* at 31). The ALJ noted the inconsistencies between Ms. Belesh's initial filings with the SSA and the medical evidence on the record. (*Id.* at 31). For example, Ms. Belesh stated on May 15, 2009, that D.A.'s ability to communicate was limited, but none of records of his treating clinicians, his school records, or his behavior at the hearing supported this claim. (*Id*. at 171). Even her statements to clinicians that D.A. was frequently oppositional and an "instigator" were in conflict with her October 28, 2009 report to the SSA that D.A. could make friends, get along with adults, and get along with teachers. (*Id*. at 201). The ALJ also pointed to D.A.'s "bright" behavior at the hearing, which was inconsistent with Ms. Belseth's reports. (*Id.* at 31). On the whole, the court cannot conclude that the evidence before the ALJ was not rationally adequate to find Ms. Belseth less than fully credible. Given that her reports had bearing on the assessments of D.A.'s treating physician and counselor, the ALJ had reason to question the self-reporting that formed the basis of the clinicians' conclusions.

Moreover, the ALJ also recognized that not all the treating physicians drew the same conclusions as Dr. Nazarian, Mr. Kennedy, and Dr. Hylton. While too much emphasis may have been placed on Dr. Pollack's determination that D.A. was a "delightful boy," Dr. Diggins' report

12

did in fact reflect less substantial limitations that the other treating doctors.[3] This explanation indicates that the ALJ considered pertinent factors set forth in 20 C.F.R. § 416.927(c)(2)-(5).

It is the Commissioner's duty, through the ALJ, to "resolve conflicts about the evidence." *Ortiz*, 955 F.2d at 769. Here there is substantial evidence referenced in the ALJ's findings, and elsewhere in the record, to support her determination that the treating physician's statements should be given only "some weight."

### *Weight Accorded Non-Treating, Non-Examining Sources*

It is well established in this circuit that an ALJ may accord substantial weight to the opinions of non-treating medical reviewers. *See Quintana v. Commissioner of Social Security*, 100 Fed. Appx. 142, 144 (1st Cir. 2004) (holding ALJ could place greater reliance on non-examining doctor's reports where doctors had reviewed the record and supported their conclusions with reference to medical findings); *Dirvigilio v. Apfel*, 21 F. Supp. 2d 76, 81 (D. Mass. 1998) (finding ALJ could rely more heavily on non-examining physicians reports where medical files were reviewed carefully, most of the evidence was available, and reports were supported by objective medical evidence). An ALJ can assign more weight to non-examining medical reviewers even where these opinions contradict the opinion of treating physicians. *See Arroyo v. Secretary of Health and Human Services*, 932 F.2d 82, 89 (1st Cir. 1991) (holding ALJ is not required to give greater weight to treating physicians and can justifiably rely on non-examining medical reviewer); *Shields v. Astrue*, 2011 WL 1233105 at *7 (D. 2011) (finding ALJ may reject treating physician's opinion as long as an explanation is provided and the contradictory opinion is supported by substantial evidence).

---

[3] The court notes that the remaining clinical records, discussed *supra*, which the ALJ did not quote but referenced in her decision, also indicate that while D.A. still displayed anger issues and hyperactivity through 2001, he also made many improvements during his course of treatment.

The ALJ gave a rational explanation for the great weight that she assigned to state medical examiners as required by 20 C.F.R. § 415.927(e)(2)(ii). The ALJ explained that the state medical examiners were familiar with SSA regulations and policy, and that these reviewers based their opinions on the medical records. Furthermore, the ALJ indicated that the state examiner's opinions were based on objective medical evidence in the record, and not on D.A.'s self reporting about his limitations. Lastly, the ALJ noted that the state examiners' opinions were consistent with other evidence in the record. The court again concludes that this resolution of the conflicting medical reports is supported by "such relevant evidence as a reasonable mind might accept as adequate." *Richardson*, 402 U.S. at 401.

D.A. argues that the ALJ erred by giving great weight to the opinions of the non-examining doctors because they did not see all of the evidence in the record. Two non-treating medical reviewers conducted assessments in August and September of 2009 and two more did so January and February of 2010. (*Tr.* at 285-292, 332-337). The only evidence D.A. contends they did not have are those pieces of the record that were not created until after the respective assessments. However, the First Circuit held that the opinions of non-treating medical examiners can be entitled to substantial weight where they had only most, but not all, of the evidence for their review. *Berrios Lopez v. Secretary Health and Human Services* 951 F.2d 427, 431. (1st Cir. 1991). An ALJ may also rely on a state medical examiner's opinion where the subsequently added medical evidence does not establish any greater limitations. *Ferland v. Astrue*, 2011 WL 5199989 at *4 (D. N.H. 2011). The evidence added to the record after these evaluations shows that D.A.'s conditions were either improving, (*Id.* at 434), or stable and thus accurately reflected in the records that the non-treating doctors reviewed. (*Id.* at 429).

The ALJ reasonably found the non-treating physicians' assessments to be consistent with the record as a whole. For example, Drs. O'Sullivan and Mundra properly noted that D.A. had ADHD, anger issues, anxiety, oppositional behaviors, and needed regular redirection to stay on task, and found these limitations to be less than marked. (*Id.* at 334). This mirrors the opinions that Dr. Nazarian articulated months after the completion of the state review; she stated that D.A. had problems with inattention, hyperactivity, and impulsiveness due to ADHD, issues with defiant behavior, and needed frequent redirection to be brought back on task. (*Id.* at 429). Based on their substantial review of the record and consistency with the record, the non-treating physicians could reasonably be given great weight, and the ALJ thus did not err in according such.

## *Whether the ALJ Erred in Making Credibility Findings*

D.A. asserts that the ALJ improperly found the testimony of Ms. Belseth not fully credible without supporting her finding. It is the province of the Commissioner to "determine issues of credibility and to draw inferences from the record evidence;" the resolution of conflicts in the evidence "is for the [Commissioner], not the courts." *Ortiz,* 955 F.2d at 769. Credibility findings made based on the ALJ's personal observation should be upheld if they are adequately explained and supported by the medical evidence in the record. *Perez v. Secretary of Health and Human Services*, 958 F.2d 445, 448 (1st Cir. 1991). In this case, the ALJ noted that D.A. presented as "bright, lighthearted, and extremely social at the hearing", and that this contradicted some of Ms. Belseth's testimony about the severity of D.A.'s symptoms. (*Tr.* at 31). The observations of the ALJ are supported by adequate evidence in the record. For example, Dr. Diggins noted that D.A. was pleasant child, whose affect was bright and hopeful, and that D.A.

15

was cooperative and easy to please. (*Id.* at 306). Dr. Pollack also came away with the impression that D.A. was a "delightful boy" based on her treatment of him. (*Id.* at 376-77).

D.A.'s educational records provide similar information D.A.'s 2009 – 2010 IEP indicates that D.A. was "polite, considerate of others, talkative, and easy going." (*Id.* at 210, 268). Further, a March 2009 progress report indicated that D.A.'s cooperation and attitude were satisfactory. (*Id.* at 277). The ALJ adequately explained his credibility finding, noting Ms. Belseth's testimony regarding D.A.'s impairments and symptoms conflict with much of the record and with the ALJ's own observations, which are supported by the record. Therefore, this Court cannot find the ALJ erred in making a credibility determination.

*Whether the ALJ Improperly Submitted Her Lay Judgment for That of Medical Professionals*

Finally, D.A. argues that ALJ came to her own lay conclusion that D.A. was not disabled and then preceded to improperly discount the opinions of D.A.'s treating physicians with respect to the severity of D.A.'s condition. There is no basis for this argument. The ALJ reported that she heavily relied on the opinions of expert state medical reviewers who reviewed evidence in D.A.'s case record. As previously discussed, such opinions amount to substantial evidence where they are a reasonable and consistent reading of the record as a whole. 20 C.F.R. § 416.927(e). Furthermore, the opinions of non-treating state medical reviewers can be given more weight than the opinions of a treating doctor under appropriate circumstances. SSR 96-2p. The ALJ did not discount the treating physicians, she merely accorded their opinions less weight than she did the state medical reviewers. (*Tr.* at 30-31). There is no requirement that treating physicians be given controlling or great weight in every case; the ALJ must determine the proper weight to be accorded various sources by considering the record as a whole. 20 C.F.R. § 416.927(c). There is

nothing to suggest the ALJ merely came to her own lay opinion. As her decisions shows, the ALJ relied on the medical opinions she found most reliable and consistent with the record, and gave an explanation for her findings that this Court finds is based on rationally adequate evidence. Therefore, the Commissioner's decision will not be overturned on the basis that the ALJ substituted her own lay opinion.

## Conclusion

For the foregoing reasons, D.A.'s for Motion for Order Reversing the Decision of the Commissioner (Docket No.12) is ***denied*** and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Docket No. 17) is ***allowed***.

**SO ORDERED**

/s/ **Timothy S. Hillman**
TIMOTHY S. HILLMAN
DISTRICT JUDGE